So we'll hear our first case and only case with this particular panel. Pennsylvania Professional Liability Joint Underwriting Association versus Governor et al. And a lot of numbers include, I'll give them all, 18-2297, 18-2323, 19-1057, 19-1058, 21-1099, 21-1112, and 21-1156. And we'll hear from the appellants first, of course. Good morning. And before I begin, I wanted to heed the Court's frequent admonition that the Council not argue the same issues. So we have an allocation of the issues. I'm representing the General Assembly. I'm going to speak for 10 minutes on the threshold question about whether the JUA has constitutional rights, the Dartmouth issue. Okay. And then I'm going to turn it over for the next 10 minutes to Mr. Kirkpatrick. He's from the Attorney General's Office. And he's going to address what we call the JUA 3 issue. So the takings clause analysis, the First Amendment, right to counsel issue, the contracts clause, due process, and severance. Okay. So I'm going to lead off with the Dartmouth issue. Great. Again, good morning, and may it please the Court. My name is Carl Myers from Stevens & Leon. I'm here today representing the General Assembly of the Commonwealth of Pennsylvania and four of its elected leaders. These cases present a threshold fundamental question that arises from federalism, and it relates to the relationship between states and the entities they create. Yeah, I think we're well familiar with it, and we've got pretty limited time and a lot of questions. Fire away. Could you, first off, the district court seemed to think that the Pennsylvania State Commonwealth's government was trying to have it both ways, that you wanted, on the one hand, to set up this entity and not have to touch it and have it fund itself, and, you know, that would be great. Don't touch the state coffers. And then when it gets some money in its pocket, then say all of a sudden, okay, now you're an organ of the state. Is there any traction to the district court's perception that this thing, by original intent, was meant to be private? And you can see it by the way they set it up. And by history, it was private, because you can see by the way they never touched the thing in any meaningful way, and therefore it ill behooves the Commonwealth to come forward now when it wants to get its hands in the GOA's pockets and say this was a public entity all along. Can you speak to that piece of the district court's analysis which says you can tell something about the original intent of the statute by the way they set it up, and there's something to be learned from the history of this? Well, first of all, as to the original intent of the statute, there's no positive indication anywhere in any of the General Assembly's enactment that it ever intended to set this up as a private entity. Now, what it did was it mimicked private industry. And that's consistent with Holt and Hess and a variety of other cases that say that states are laboratories of democracy. They have a free hand to manage their internal affairs. And so here the Pennsylvania government faced a medical malpractice crisis. Doctors couldn't get insurance. There was a lack of health care access. So the Commonwealth decided to tackle that by saying to private industry, you created this problem, so you have to fix it. We're going to make you fix it. Okay. There you go. Doesn't that make their point, that this was the Commonwealth saying to private industry, you made the problem, you fix it, we're telling you to fix it, here's the structure within which you fix it, and go. In other words, private problem, private fix. Right. But the Commonwealth of Pennsylvania had the freedom to choose that method or any other. Again, the Commonwealth has a free hand in managing its internal affairs, and it can experiment with entities however it sees fit. That's true, but we're trying to figure out what it was doing. Well, here it was an original 1975 enactment, the 2002 NCARE Act, all the enactments, even though they make it look and feel as if the JEA is a private entity. In fact, nothing about the enactments suggests it was a private entity, because every bit of its existence was circumscribed by statute. Its very purpose, its very reason for being, its creation, were conceived by the Commonwealth and set by the Commonwealth. Its purpose is to offer medical malpractice insurance to those who cannot obtain it on the private market. That is a statutorily dictated mission. Could that be, could that have been, could they have put in the statute, and this is a private entity? This is a public purpose, but this is a private entity. They could have, and actually that, Judge Jordan, that actually goes to one of the criteria under the Dartmouth analysis, which is if there is a positive statement in law that says we are creating a private entity that has constitutional rights, then the Commonwealth can do that. We have a complete absence of that here. Well, when you say complete absence, there's the question, right? That's the thing we're wrestling with. Does it have to be a statement that clear to make it a private entity? Yes, it does. Well, you take a shot, and so do the executive defendants at the governor for, excuse me, at the district court, for taking what you guys put in scare quotes, a holistic approach. But if there's not a statement, a clear statement in the statute, does that mean, oh, that means it's not a private purpose? Or does that mean that a court has to kind of look at things to figure out whether it's public or private? No, there has to be an affirmative statement, Judge Jordan, because of the nature of the power we're talking about. This is inherent authority. The City of Trenton case and then every case after it have always held that states have a free hand over the creatures they create to solve public policy problems. And the federal constitution doesn't stand in between the state and the entities it creates. So it's not as if the Commonwealth could fumble away or inadvertently or accidentally create. It's inherent authority that can be exercised at its will. It doesn't have to, as if it was an insurance company, reserve its rights to its authority. It's inherent. It can use it whenever it wants. Now, you really rely heavily upon Dartmouth. And you, in fact, say it's the Dartmouth, application of Dartmouth. I don't know whether your friend across the aisle would agree with that exactly. But first off, maybe you're cabining Dartmouth a little too narrowly to a very strict bright-line test. And also, I can't help but notice that Dartmouth hasn't really been applied the way you apply it in this case, I think, anywhere in like 200 years. So what does that mean? Well, it doesn't mean much. All it tells us is that this issue doesn't come up very frequently. Admittedly, there's a paucity of the case law. There's not a lot of cases. Right. But the case is that in this context and in this context and in similar contexts involving creatures of the state, the Dartmouth case is the controlling case. It's the sort of wellspring from which all the other cases spring forth. And Dartmouth gives us two basic principles. Is it an instrument of government? And is the state alone interested in the entity? So it really sets up a question of – That's not all it does. It goes to the question of, like, is this holistic or not? The actual language is, if the act of incorporation be a grant of political power, if it create a civil institution to be employed in the administration of the government, if the funds of the college be public property, or if the state of New Hampshire as a government be alone interested in its transactions. There's not like it's saying if, if, if, if. It appears that it doesn't say, hey, here are two things to look at, and there's your bright line. It looks like it's looking at this particular case and saying there's a bunch of factors. You should be paying attention to all these things. That will give you the guidance. That's not the message to take? That isn't the message to take. Why run through those? Well, the phraseology in Dartmouth is in the disjunctive. The actual – in the application of the analysis, it really does distill down to the two factors. Admittedly, we're reading a case from 1819, so there's – that poses its own challenges. But the best way to read that is as a disjunctive, because that really reduces or distills Dartmouth to its critical essence, which is that it's a simple, understandable way for us to see how the federal constitution plays a role or doesn't play a role in these circumstances. Walk – if my colleagues will indulge me, walk me through how you get to two factors that are clearly what's meant by the paragraph, the money paragraph, which you quote. I think everybody quotes this paragraph. How do you get to these are the two things out of that language? The language, as I read it, is there's two passages that we're relying on. One is the passage that state authority over entities is not founded on their being incorporated but on their being instruments of government created for its purposes. So that's – that phraseology gets to the public purpose, that the wheels were set in motion by the government, and that's your sort of police power element. Then the second piece of the puzzle is the language that says, if a state creates a civil institution to be employed in the administration of the government, and if the state be alone – it's the key language, Judge Jordan, is that be alone interested in its transactions. So in other words, is the state the only one in here, or is there a private party involved? And that's actually – that animates the morales in all these other cases. There's individual rights involved. That's where the federal constitution comes in. But there are private parties. There are private parties involved, right? It's all private money. No. No, they're not private. The only – the only party – It's funded by private money, correct? Well, much like many things are funded by – Is that right? It's funded by public money, no government money, correct? The funds are – originate as private funds. They immediately, once they hit the J-Ways accounts, they become – The question's real simple. The state doesn't contribute money, correct? That's correct. These folks are not on the state payroll, correct? That is correct. But remember – Don't get any benefits from the state, correct? I'm sorry. Who does not – No benefits. Who gets no benefits? The employees get no benefits from the state. I do not believe that they are employees of the state. But it's a – the premiums are paid by state command, by the command of the General Assembly. The General Assembly – It's like every insurance company in the state operates the same way. But also, Judge Restrepo, just like a municipality, which is a creature of the state, also assesses fees for things like zoning permits. Right. The fact that they assess zoning permit fees doesn't make every construction company a public entity. The fact that we pay taxes doesn't mean that the government – that we're public entities. But, Judge Jordan, all of those private construction companies, those are conceived, they're started, they're funded by private parties. There's a private individual constitutional right that is at the inception of that entity. The J-Way does not have that. There is no private individual constitutional right that animates anything in this case on the J-Way side. That's the – well, it feels a little like you're asserting your conclusion and not leading us to it. And that's the – that's part of what makes this difficult. Because you're saying, you know, there's no private interest here. And yet, as Judge Restrepo pointed out, other than pushing the ball forward, what else do you have? Other than saying, okay, I've started the ball forward here. I've created you. What is the – how do you take the monies and the management of this entity over the course of now better close to 50 years and just say that's meaningless, which is what it sounds like you're saying. It sounds like what you're saying is it's really not even a two-part test. Here we're talking about a one-part test because that second part of the test, no private interest, that's just a no-brainer. There's nothing going on here. What I'm saying is what looks like something that has been set adrift to operate on its own is really a state experimenting with a type of entity within its police power. And so, for example, the 1975 Act said that the insurance commissioner could have done any number of things to set up the J-Way. It could have set it up as a department within the insurance department. If that had happened, we wouldn't be having this conversation here today. Indeed. But then – That was the district court's point. But then – well, that's because that would have been an easy case. But that doesn't – just because the Commonwealth does it in one way versus another doesn't make it any less a creature of the state, doesn't make it any less an internal operation of the state solving its own public policy problem. And it still doesn't change the fact that the state can't fumble away or inadvertently give up its sovereignty, its power within our dual sovereignty system by accident. No question. The problem that I think – the thing that makes this a challenging case is when you say they can't fumble it away inadvertently is we're trying to figure out whether it did what it did advertently, if that's a word. Right? Judge Jordan, it didn't. They did it on purpose. Judge Jordan, it didn't. The only way that you can get there to the conclusion that it did it on purpose, that it purposely gave away its authorities, is by misreading all the statutes. Every edition in the statutes suggests that this was, while it was supposed to mimic private industry, it in every other way was intended to be public in nature. Okay. And, Judge Jordan, I did want to answer – I know I'm far over my time. Did you reserve time? We reserved five minutes. And so if you'd like to – Well, you can pick that up in your – whatever it is you're going to say in your five minutes. I just wanted to respond to Judge Jordan's last question about the private interests. Okay. My last point, and then I will sit down, is all you need to do to analyze whether there's a real private interest here is look at what the JUA is claiming. The JUA is claiming these monies for itself in its own right, not on behalf of its members. That sets this case apart from Morales and the others. It's not saying that any of the policyholders have any right to the money. It says it itself, the JUA, has a constitutional right to this money and nobody else. So there is no private interest that lies behind their claim. So we would simply ask the Court to reverse and reinstate the three enactments. Thank you. Thank you. Good morning. May it please the Court, my name is Sean Kirkpatrick with the Pennsylvania Office of Attorney General here on behalf of the Governor and Acting Insurance Commissioner. And obviously this is a large case with a lot of issues. So although we agree wholeheartedly with the General Assembly as to the public status of JUA, I'm going to assume, Arguendo, for purposes of Act 15, that JUA is a private entity. So if we determine that it's a private entity, do we need to get to Act 15? Yes, Your Honor. Because the District Court upheld several aspects of Act 15 under its prior ruling that JUA was a public entity. So are you here defending the part that it upheld? Or are you here attacking the part that the District Court struck down? Because didn't the District Court strike the parts down in 15 on the same basis that it struck down Acts 41 and 44? Well, I would like to do both if I have time, but not exactly, Your Honor. So what the District Court recognized, we believe a little bit belatedly, is that JUA is not, as JUA says on page 19 of their reply brief in the third case, is not just an independent private nonprofit corporation. It has never been a corporation. It is not the same as just any kind of private insurance company. It is a unique creature. So it's not a corporation? It's not a corporation, but it's not just like any other private insurance company. It is an integral part of the MCARE regime. And so because of that, the Commonwealth has significant interest in transparency and accountability of its creation and the medical malpractice insure of last resorts. It has a statutory duty. It must provide a certain kind of product to a specific customer base. And that exists, JUA exists, because the private market failed and these individuals can't get this product elsewhere. So when we get to, for example, the right of counsel, First Amendment, due process, where the District Court erred, at least what I want to talk about, is in its conflation of Commonwealth agency and executive agency under the Commonwealth Attorneys Act. So Commonwealth agency... Okay, go ahead. I'm sorry. It sounds like you're about to do what I was going to ask you to do, which is explain what you're talking about. I don't understand that distinction. So under the Commonwealth Attorneys Act, this is Section 201 in the definitions, Commonwealth agency is an overarching description. And under Commonwealth agency, there are two subsets. One is executive agency and one is independent agency. The District Court did not appreciate that distinction. Well, the District Court was saying, reaching back to its private entity holding, and in effect I think saying, I don't care what label you put on it, you know, you might have 100 different little boxes where you put your agency lawyers or how you define them. You still don't get to make these people take a Commonwealth hired attorney and speak for them because they're a private entity. Isn't that the bottom line here? We're back to private entity? That's where the importance of whether it's an independent or executive agency matters, Your Honor, because under 403 of the Commonwealth Attorneys Act is called the supersession and intervention provision. Do you know what Judge Restrepo is getting into? We need to sort of know the scope. If we say it is public, I mean, what is it we have to decide with respect to Act 15? I'm sorry. I misunderstood the question. I thought you were saying if it was considered to be a private entity. If it's a public entity, then they cannot, yeah, Act 15 issues go away because they can't bring claims against its creator, and we would agree with that. But if it's a private entity, you think that private entities can be forced to have somebody speak for them that they don't choose? The Commonwealth, no, Your Honor, because the Commonwealth Attorneys Act, again, under Section 403, provides that the Attorney General's office, my office, is provided as free counsel. Yeah, they don't want you. I mean, I'm sure they're not trying to insult you, but their whole point is you might be lovely people, but they don't want you speaking for them, and we're a private entity, and we get to pick who we want to have speaking on our behalf, and the state can't make us take somebody to speak on our behalf who we don't want. So, like, cut through that for us if you can. Okay. So 403 of the Commonwealth Attorneys Act says that if we refuse, if they come to us and ask us to delegate and we refuse, they have a right to intervene on behalf of themselves. Such intervention shall be a matter of right, and when exercised, confer upon agency counsel. I'm just not – I'm sorry, but maybe it's – I'm just – They don't have to. I'm not following how the starting point of this is your state statute. I thought that the starting point for this was public or private. So are you disagreeing? Are you saying that the state can say to a private party, any private party, we've got a lawyer for you, take them. Whether you like it or not, take them. No, Your Honor, but that's not what the Commonwealth Attorneys Act is doing. Well, how is it not doing that if you start from the premise that they're a private entity? Yes, because Section 403 allows them to reject us and choose the counsel of their choice. So, okay, so you think it's – you can give people a choice and that's not problematic because you've given them a choice. Because we're providing free – if the courts decided that in civil cases that there would be a plaintiff's, you know, pro bono plaintiff's bar, that people can have free access to attorneys if they'd like it. But they don't have to take it. So are you conceding that if they had – if the circumstance were not Commonwealth attorney but executive attorney, I think is the word you used, maybe I got that wrong, that that would be an unconstitutional First Amendment problem? I believe, Your Honor, that if they're considered an executive agency, then the general counsel gets involved. It's their counsel that they must use. And that creates – may create a constitutional problem, which is why the canon of constitutional avoidance suggests if you're going to read an ambiguous statute, and the fact that Act 15 makes them a Commonwealth agency, not necessarily an independent agency, creates a little bit of ambiguity. But just because they're not on the list in the Commonwealth Attorneys Act for an independent agency does not mean they aren't an independent agency because PSERS, Public School Employment Retirement System, is an independent agency. It's not on that list because that list was created in 1980. Sears is not on that list. There's the – blanking on the – I think there's a Philadelphia River Association that is not on that list. So the question becomes, a court has a choice. It can either say it's an executive agency, which if it's a private entity might raise constitutional issues, or it's an independent agency because it's a private entity, but it's still a creature of the state. Was this argument presented to the district court in this fashion? Did you come to the district court and say, hey, it's a Commonwealth. We're offering them a choice because they're Commonwealth lawyers. Or is this something that's being articulated to judicial officers for the first time, Mr. Kirkpatrick? We, down below, argued that they were an independent agency. And I guess the question you're asking is, have we waived this? Well, actually forfeited. Or forfeited. The waiver is whether the issue was raised below. We raised the issue below. Did you raise it in this fashion? Did you say to the district court, look, as you're wrestling with this question of First Amendment and who's speaking for the entity, just please keep in mind that there are Commonwealth attorneys and there are executive agency attorneys. And these are Commonwealth attorneys, and we're offering them a choice. Did you say that to the district court? We did say that we were offering them a choice. We, on appeal, our arguments are based upon a response to what the district court held. The district court made an error in conflating two statutory definitions. So we're responding to that error. The question that I'm trying to put to you is, did you explain to the district court there are these two statutory roots? Please don't worry about that one, the executive agency one. Focus on this one, the Commonwealth one. Did you tell the court that? Because if you didn't tell the court that, how is it not a forfeiture to come here and make that distinction? I'm pretty sure we did tell the court to go down that pathway and explain that it is not a violation of the First Amendment because they get to choose who their counsel is. We, as we argued down below, and in our briefs here, we are providing a free counsel because the Commonwealth has an interest in ensuring that this entity is treated as a public entity. Well, is viable. In your world view, what is the JUA? Is it a private or is it a public entity, or is it somewhere in between? So stepping out of Act 15, it is a public entity, Your Honor. It is a creation of the state. I see my time is elapsed. I have one, too. So as we argue in our briefs. Well, what's an independent agency? You referred to an independent agency, right? Yes. So is that a hybrid? An independent agency is a creature of the state that is not under the control of the governor, under the executive agency. It's kind of a hybrid. It is a hybrid, Your Honor. It can be self-funded. A lot of appeasers are... But an independent agency is not a private entity. No, it is not a private entity, Your Honor. And, again, there's two baskets when it comes to the Commonwealth Attorneys Act. There's executive agencies, which are under the control of the governor. They're in the executive. And then there are independent agencies. What Act 15 does is says, even if you're a private entity, because of your important integral role in this very public health care regime, we're going to, for purposes of right-to-know law, for purposes of Penn Watch, for purposes of the Commonwealth Attorneys Act, we're going to treat you as a Commonwealth agency, which means you get access to attorneys from my office, but under 403 of that same Act, you are not required to use them if you don't want to. I have one last question, a general one. I read in a paper there was an election recently. I hope you'll let us know if things change under the new regime, if anything changes here. Absolutely, Your Honor. And on that point, and I apologize if I should have sent a Rule 43 letter, the insurance commissioner since these began is now acting insurance commissioner Mike Humphreys. Obviously, it substitutes automatically. We don't think it mattered that much. Well, sometimes things change after elections, so I hope that you'll let us know so we don't spin our wheels as it were. Absolutely, Your Honor. If anything substantively changes, we will absolutely do that. Thank you. Thank you, counsel. May it please the Court. Kevin McEwen, on behalf of the Pennsylvania Professional Liability Joint Underwriting Association. We've been calling that JUA. I'd prefer to continue to do that. I'd like to start out with the point that Judge Jordan was talking with Mr. Myers about, which was whether the creation of this entity, JUA, was inadvertent. That is, the state, as he would put it, made a mistake. They didn't realize by creating this entity that they were creating a private entity. But it wasn't inadvertent. It was a conscious choice. The act that we're talking about here, the 75 Act, as we call it, the Cat Fund Statute, it said that the insurance commissioner could do one of two things. He could create the entity within the agency, the insurance department, or he could set it up as a, get a joint underwriting association to do the work. Now, you're not suggesting, are you, that by the mere fact that they chose not to put it within the agency, ipso facto, that made it a private entity, are you? Absolutely not, Your Honor. Okay. So that doesn't really answer our question. The question, would you agree that sort of the fundamental baseline question beginning in JUA 1, running through JUA 2 and 3, through all these decisions, and the preliminary injunction decision is whether this entity is a public or a private entity. That's the baseline question, right? That is the question. Okay. Now, in the governor's opening brief, they posed this hypothetical about, like, imagine this entity, the JUA, were being sold. Who would you write the check to? And in your brief, you push back on that and mock it a little bit and say, well, you know, say it's a silly question, but in essence, you say you just don't understand. This is, you know, this is a nonprofit, and it can't be bought and sold, so what? But that seemed to me to kind of dodge the central issue, which the hypothetical was getting at, and I thought pretty well, which is if this is a private entity with private interests, who's got the claim on that money? Because this is, when you strip it all away, I mean, this may have turned into something more than just about the money, but it started out about the money, and it feels like it's still about the money. There's $300 million sitting in there, and they want it, and you don't want to give it to them. So if you don't like the sale analogy, pick dissolution. You'd have to concede that having given birth to this, the General Assembly could take it to its grave and dissolve it, right? Actually, maybe it's not. Maybe you're saying, no, we exist forever. No one can touch us. Is that your position? No, Your Honor. Okay. Could they dissolve you? The General Assembly could, in theory, dissolve JUA. I'm not saying that we would take it, but in theory, we would. I'm not saying we would take it. That's a legal position. That's the very thing I'm asking you. Are you saying they couldn't do that? What I'm saying, Your Honor, is if they did that and lawfully did that, could they lawfully do that? I think that's a question of state law under the nonprofit association law. It's not really a question of state law. I'm asking you this because we're here on a federal constitutional claim, which you're asserting can't be entitled to bring because you are a private entity. So perhaps you're right that it's a question of state law, but it seems a little bigger than that because it sounds like what you're saying is we can never be touched by the JUA. They can never make us go away. Is that actually the position you're taking? No, Your Honor. What I'm saying is they can't take the money. Well, if they dissolved you, where would the money go? To our nonprofit purpose. And there's a wind-up provision under the nonprofit association law that shows how the assets get distributed. And what is that? And how would they be distributed? Would they be distributed to the member organizations? Because I think you've taken the position that they wouldn't, right? They wouldn't, the various insurance companies that contribute, they wouldn't have a claim on that, right? The way JUA's plan reads, it's that the JUA board of directors would decide what to do with the assets with the approval of the insurance commissioner. It's not the veto, well, I guess it would be the veto power of the insurance commissioner, but it's not the insurance commissioner's ability or right to say where the assets go. So the insurance commissioner could, for example, serially disapprove distributions of the assets that are proposed. And if that were to happen, we'd end up with a state law fight, an appeal to the Commonwealth Court of Pennsylvania from the insurance commissioner's repeated refusals to approve the plan of distribution. So what you're saying is there's no way to know who would get this money? Well, we know this, it wouldn't be the member organizations, right? It wouldn't be the organizations that contribute because the public purpose isn't to benefit the insurance companies, is it? In theory, Your Honor, it could be whatever everybody agreed to. It could be a redistribution of assets to the insureds. Remember, this is a non-profit corporation. Well, we heard it's not a non-profit corporation. It's an association. It's an association. I misspoke. I'm sorry. All right. Yeah. So maybe it sounds like what you're saying is the money somehow goes to the public because this is for the public good and somehow this is going to be distributed out to the public. Well, it's for the non-profit purpose of the association. Which is to benefit the public, right? Well, ultimately, yes. And so it would depend on how large you would read that decision. Okay. Why isn't this a public corporation then or a public entity? Well, the non-profit purpose, as filed with the IRS in our 501C6 application in 1976, the non-profit purpose is to make sure that the medical community has adequate coverage. Right. And so, for example, when Hahnemann ---- Sounds like a public purpose. Well, and Judge Conner, the district court judge, said that. This is a public purpose. The JUA was used as a private entity to achieve a public goal. Yeah. Do the members have a pecuniary interest in these monies? Well, they do in two senses, Your Honor. One is that they've always been subject to assessments. Have they ever? They've never been assessed. But they've never been assessed. And the assessments would be paid back anyway. That was always the plan. Where's the authority in the record that gives the association the authority to assess members? Where do I find that? In three places, Your Honor. Actually, it may now be in the plan of operations. In the plan of operations, yes. But not in the statute, right? Not in the statute. Because the statute basically gave the association full authority to create its whole structure and everything about it. There are only two or three. When you say it's the full authority, I thought it gave them the authority to propose and for the commissioner to approve or disapprove. True. Okay. So that's not full authority. They weren't just sent off and said, do whatever you want. They were under the direction and supervision of the commissioner. The commissioner could have acted more aggressively, chose not to. But the commissioner's got the power to approve and disapprove. And, in fact, didn't the commissioner tell the JUA that it didn't like and it wanted it to take out of it certain provisions? Yes. And the JUA didn't do that? Well, the JUA has taken out of its plan as of 2018. And that would be in the record for the second case at 171. That's the current plan of operations. And removed from that is the explicit authority to assess members. In all the previous plans. Is that the pecuniary interest? Well, I would say so, Your Honor. I mean, the members get to pay it back if they get assessed. So it's a hypothetical pecuniary interest because it's never happened, right? The members don't pay to join the association. Correct. This is funded by premiums. Well, not initially. The members, you know, this was set up in the hallway or ante room of one of the association members. In the here and now, the members don't pay to join. Correct. They have to join, but they don't pay to join. Correct. And it's funded through premiums. Correct. Your Honor, the pecuniary interest of the members would be this threat of a potential assessment that's never happened. Well, that's one. The other is, as they said in their plan of operation or in their application to the IRS in 1976, we have essentially a reputational interest in this because people haven't been able to get insurance. We're now going to be able to provide insurance. And so we have, you know, we have that skin in the game, if you will. We have the interest in having the insurance industry perceived more favorably than they currently are. The money doesn't belong to the members. The money does not belong to the members. And they have no expectation of any type of a distribution of any sort, right? Correct. Like a dividend or anything else, right? Correct. And they have no expectation of being assessed any monies, right? Well, if they were, they'd be paid back. So I thought maybe I misheard you. Did you say a minute ago that the commissioner had, in fact, been telling them, hey, take the assessment piece. You claim the authority to assess the members' fees. Take that out of your plan of operation. And they didn't do it, and they didn't do it. But in 2018, they did do it? Yes, and that's in the record set that I gave you. Okay. So it's not in the statute that they can assess them. And now it's not in the plan of operation that they can assess them. Well, there's still a part of the plan that describes the broad powers of the Board of Directors, and one of their powers is still to assess. Well, so it's still in the plan of operation. That word is still in the plan of operation. All right. Even though the commissioner said, you don't have the power to assess, take it out. It's still in. The reason the commissioner said that is because the commissioner's interpretation of the MCARE Act from 2002 was that you couldn't assess in a deficit situation. There's never been a deficit. But you couldn't assess in a deficit situation unless you borrowed. Yeah. So, I mean, you had to borrow. There's no claim on the monies, and there's no power to assess, at least in the commissioner's eyes, it sounds like, and you've been told directly to take it out. So if there's no, you know, if the Commonwealth is telling you, and they've got the power to tell you, don't assess, and you acknowledge that you don't have a claim on the monies, where's the private interest? It's the same private interest that any nonprofit association or any nonprofit has. Well, not every nonprofit is set up by the Commonwealth of Pennsylvania. I mean, there are nonprofits that are set up all the time, and they're private entities, but they're not creatures of the state the way the state is arguing here. The Commonwealth is coming forward and saying, we made them, and we made them for a public purpose, and there's no nonpublic interest that's got a claim or a right to this entity. Who's got the right? That's why I asked the dissolution question. I think that's why they posed the sale question. Who's got the right to this entity and its assets? Since we're fighting over the assets, who's got the right to the assets? I would call it a right to direct the money somewhere, and the right to direct the money somewhere has to be consistent with the association's nonprofit purpose. And at the end of the day, the commissioner, the insurance commissioner, has veto power. Has veto power. So if he doesn't like, if he or she doesn't like what the board of directors, where they're directing the money, the insurance commissioner can step in and say, no, we're not doing that. Correct, and then the board would have to go back and come up with another plan. A plan that satisfies the insurance commissioner. Well, not necessarily, because if the insurance commissioner ultimately continues to reject these proposed distributions, there'll be a challenge in state court and, you know, a claim that the insurance commissioner has abused his discretion at a minimum. I mean, that's because it's not that the insurance commissioner has the power to say, here's where the money has to go. No, but you say, no, we're not sending it there. Exactly. Right, I get it. Okay. Can I ask you a question, because we've been talking about state courts a fair bit. Should we be certifying this to the Supreme Court? Let them sort out the Pennsylvania statutes and the interplay between them, rather than us doing it. Well, on the fundamental question proposed, I think it's a federal question, Your Honor, and I think you have all that you need to decide the question. It's, you know, you got into with Mr. Myers. Isn't the fundamental question whether this is a private or a public company under state law? Yes. So that's the fundamental question, consistent with Chief Judge Shigera's question. And my answer is, you know, notwithstanding the appellant's claim that all these bright lines exist. There are no bright lines. The fact is, all the courts that have dealt with this. We'll get into that in a minute. It's a matter of do we, should we get the, or ask the Supreme Court of Pennsylvania to get involved here to shed some light on this question? And my answer to that, Your Honor, is Judge Conner's already sorted this out in three separate opinions, and what he's done essentially is what the state court would do. He's apologized. Well, except for that they may disagree with us, and we've all spun our wheels for years for no real reason, when we could just ask the Supreme Court to give us the definitive answer. Again, you know, it would be material to your federal question answer, but I don't think it's necessary. It would be determinative, wouldn't it? It's not just material. It's determinative. That's why right at the jump we asked you, isn't this the fundamental question, public versus private? If the state Supreme Court thought this is a public entity, that would be game up for the JUA, right? Yes. Okay. Well, let's move on then to, this case is rather confounding. There's not, you know, the Supreme Court, the United States Supreme Court hasn't said here's your test. Apply it. So a lot of times we apply a test and it's a real question. Your friends point to Dartmouth. You talk about a holistic test. Let me ask you, if we apply the test that you propose and the one that Judge Conner applied, should there be other inquiries or other things we ought to consider in terms of how we look at this? Clearly we read his opinions. He said here's some things. Are there other things that you think we should be considering in answering this question? I mean, there may be another case like this down the road. When we write an opinion, you know, it will have to be followed by the district courts in this circuit. Would you augment it in any way? Well, one of the factors that you could look at, and I guess sort of Judge Conner did look at this factor, is who actually controls the entity. And, you know, there are Pennsylvania cases that say, you know, for example, there's the Penn State versus Derry Township case we cite in our brief. You know, the court there said, well, you know, the Board of Directors is all private. You know, the state's not involved in running the college anymore. Interestingly, in that case as well, the opinion makes it clear that, you know, at one time the college was the state, but over time it became not the state. And that's, you know, a fundamental disagreement with the appellant's claim here, which is, you know, if you're a creature at the beginning or if you're simply created by a statute, you're automatically public, not private. Is that their position, or is their position that under Dartmouth, if you're created for a public purpose and there's no private stakeholder in the entity, then in fact you remain a public entity? Well, the private stakeholder refinement of if you're created, you know, so it's sort of a two-step. Are you created by a statute? If you are, you are the state unless, or part of the state, unless there are individuals who have a private interest involved. But I would say that whole formulation negates the existence of nonprofits, because nonprofits don't have people who are going to take the money. In fact, it's illegal under the nonprofit association law. But nonprofit associations are typically not created by the state, so it really doesn't negate the existence of nonprofit associations, does it? Well, it negates... We're here arguing about this because of the relatively unusual circumstance of an entity created by the state for an acknowledgedly public purpose is now something that that entity claims to be free and independent of the state, even though it remains under the direction and control, at least nominally, of the commissioner of insurance who has the power to say, get this or that out of your plan of operation, this or that with respect to dissolution. It's under that circumstance that we're talking. So if we're confining ourselves to that, and you've got reliance on the district court's cases, that is the cases the district court cited, talk to us a minute about the First Circuit cases, the Association and the Arroyo Milicio case, because the district court seemed to think those were pretty important and dispositive here. Yes, Your Honor. So in the first case, and it was not a takings case, the court went through just many of the factors that we've been discussing and that Judge Conner relied on here. And in the second case, the court just referred back to that earlier decision and said, therefore, the JUA in that case in Puerto Rico is a private entity. Right. Now, your opponents say those cases aren't helpful at all because the Puerto Rico statute explicitly states that the Puerto Rico JUA is a private entity, and that's just not the case here. If they're correct that that's what the Puerto Rico statute says, was it wrong for the district court to rely on a case as being analogous when the fundamental question was answered in the statute and it's not answered here? No, because the mere declaration is not the be-all and end-all of the question. If this statute had said this is a public entity, the Pennsylvania statute, would that answer our question for us? Or are you suggesting that you would still be a private entity because of the history and the way you operate, et cetera? I certainly think it's possible that if the entity ends up in the gray area, because of all the factors you just mentioned,  you would be in a situation where you had to sort of weigh all the factors. And to get back to Judge Chigares' question, I think Judge Conner did that. I don't think there – I'd like to tell you that there are other factors to look at, and there may be in any individual case based on the circumstances in that case, but I think he looked at all the factors here, and all the factors weigh very heavily in favor of deciding the JUA, at least for takings purposes and for right-to-counsel purposes, is a private entity. This goes to Chief Judge Chigares' question about certification in a way, I guess. But argument has been made by both the legislative and the executive defendants that there are federalism concerns here. Does the fact that this case has now been bouncing back and forth between action by the elected officials in the Commonwealth and a federal court in Pennsylvania over the course of several years and three different enactments tell us, yeah, there's a federalism problem here? I don't think so, Your Honor. What we have are constitutional rights that need to be enforced against a state overreach, and that's one of the strands of federalism. That's the hard part of federalism that Justice Marshall talked about in Dartmouth. It's the hard part of federalism that Judge Conner referred to, and there's a recent case from the U.S. Supreme Court, the Nick case, that came from this circuit, K-N-I-C-K, in which Justice Roberts, again, made it very clear that that's the whole purpose of 1983, that's the whole purpose of, you know, and it was a takings case. Should it be up to the state court to make this fundamental decision? Would that obviate the federalism issues that they've raised if it went to the state court to decide whether this was a public or private entity? Well, it would obviate the concerns that they've raised. I don't think their concerns are valid. Right. Do you have a minute left, a little bit more? Do you want to talk about Act 15, respond to what you're necessary to talk about? So on the point that Mr. Kirkpatrick was making, the statute is not ambiguous. Act 15 is not ambiguous about the choice of counsel. It describes, it says that JUA shall be treated as a commonwealth agency, and then if you look at the definition of commonwealth agency, there are executive agencies and there are independent agencies in that definition. Well, they pointed out that there's a problem with the district court opinion. What's your reaction to that? I think they're wrong. The district court got this right on what the statute says and what the statute could have done, Act 15 could have done. Instead of saying commonwealth agency, it could have said they're an independent agency. But even if we were an independent agency, we'd still have this sort of blanket of interference on whether we can hire our own counsel. There's a whole process that you have to go through to be allowed, you know, to have the permission to hire the lawyer that you want. How about the fundamental point? Has this been forfeited by your adversary for not raising it below? The argument was not raised, and I will say this, Mr. Kirkpatrick has done a nice job of making the argument. It wasn't made that way below. And so Judge Conard didn't have the benefit of Mr. Kirkpatrick's advocacy when he made his decision. But still in all, the bottom line is. No, but has he forfeited it is what I'm asking you. I understand he's a skilled lawyer and did a nice job with it, but is the issue forfeited for our purpose? I would say, Your Honor, because it's not teed up in the way that it ought to be for your consideration. All right. I see my time is up. I haven't addressed the issues on our cross appeal, but I'll stand on our brief on that. Okay. Thank you, counsel. And we'll hear the rebuttal. Before you start, would you agree the threshold issue is tethered to state law as to whether this is a public or private entity? To an extent, yes. I qualify the answer because, and I have to, because the case law makes it very clear that the labels we apply to these entities are not relevant. For the federal constitutional analysis, it's the interests that underlie it. I will say, to answer your question directly, Judge Restrepo, this is a public entity. It's a public creature, public instrumentality. Whatever label we want to apply to, it's a public label, given everything that we've talked about and briefed here today. Given the federalism arguments you've made, why wouldn't you be enthusiastically pressing for a certification to the state court? Well, and I thought about that as you were questioning Mr. McKeon about that very point. And the problem with that is there is a federal question here. And the federal question, the fundamental one, is does the JUA have federal constitutional rights it can assert against its creator? That question can't be answered by the Pennsylvania state courts. But the Pennsylvania state courts could certainly shed light on whether they think under Pennsylvania law, which you keep asserting is the pertinent law here, this is a creature of the state or not. In point of fact, Judge Jordan, the Pennsylvania courts have opined as to what this entity is. In the hospital and health system case and in the general reinsurance case, which we cited repeatedly in our briefs, the Commonwealth Court has described the JUA as a statutory facility or a risk pool. They've not described it in private terms. They've described it in public terms. Then they haven't answered the question, have they? They haven't answered the question, which is the question that's been put in front of Judge Conner repeatedly. Is this, for purposes of understanding the character of this entity, it is public or private in the sense that it is a creature of the state still to be viewed as a public entity or just was a private entity that was set up by the state? Those are two different answers which I think you'd have to acknowledge are of fundamental importance in deciding this case, right? They are to a degree, but I think it's important, and I know Judge Jordan, Judge Restrepo, I keep sort of coming back to the same point. The labels that we apply to these entities, it's important not to get tripped up on that point because there are many entities that may look and feel in a variety of different ways like different kinds of private entities, but they're nevertheless state creatures. Maybe the best example of that and the easiest example to grasp is the city of Trenton case. In the city of Trenton case, there was a privately owned, privately held water company that indisputably, everybody agreed, had constitutional rights. The city of Trenton bought that entity, and then later the city of Trenton, under the auspices of as a successor to the water company, tried to sue the state of New Jersey, and the U.S. Supreme Court said, we don't care that it was private. We don't care that it was a private corporation. You, that constitutional, all those constitutional rights evaporated because you are a creature of the state municipality. You can't sue your state creator. You're a creature of the state. So there was a private water company there. It didn't change the analysis because it was a creature of the state that was suing. It didn't change the analysis. It did change the analysis because in essence, didn't the Supreme Court say, once you were taken by the state, you became a public entity? You were no longer a private entity. The court did not say that, and the court actually said the labels do not matter. It's the party bringing the claim that matters. So now I am confused because it sounds like what you're saying, Mr. Myers, is all that stuff we've been talking about, it doesn't matter. Public versus private interest holders, doesn't matter. The only thing that matters is there was a state statute that started this. Is that where you're going? No, public versus private, Judge Jordan, to be clear, public versus private does matter because the analysis that I've been advocating for is a two-part analysis. Is there a public purpose behind it? Is there a public animating force behind it? That's fundamentally important. You're not running away from that. Right. If you're not running away from that, and you're not trying to assert now that the only thing that matters is it was set up by the state, then it has to matter, even if you're saying, don't be confused by labels. Don't let that tricky state Supreme Court fool you by calling this thing a private entity. It has to matter, doesn't it, what state law would say about this? Doesn't that have to be in the calculus? Yes, of course, because, again, it is in the calculus. I will say what I was cautioning about when it comes to the certification question is I don't think that completely answers this case, that ends this case, and, frankly, it doesn't get this case off this court's docket. It might come back. It might clarify the issues. It may clarify the issues, but, Your Honor, it would still come back asking the same question, which is even if it is, no matter what it is or how it's defined under state law, the JOA is still going to claim that it has constitutional rights that it can assert against its creator, no matter how it's construed under state law. Yes, and no matter how the state Supreme Court decides it, if it came out that it said it was a private entity, no doubt we would be seeing you back in court saying that's just a label. It's still, for federal purposes, a public entity. So, given the history of this case, there probably is one thing that can be said with certainty, and that is this case will not be over, no matter what the Commonwealth says through its state courts for it to be certified. That I would agree with. I see my time has expired. Thank you, counsel. We thank counsel for their excellent briefing and argument here. We'll take the case under review.